# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LUIS A. SANTANA, JR. | : | |
| Plaintiff, | : | |
| V. | : | |
| | : | |
| ANGEL QUIROS, Commissioner, CT DOC, | : | CIVIL NO. 3:21-cv-00376 (SVN) |
| *Official Capacity* | : | |
| | : | |
| NICK RODRIGUEZ, CT DOC District | : | |
| Administrator, *Official Capacity* | : | |
| | : | |
| JENNIFER REIS, Warden, CCI, | : | |
| *Official and Individual Capacities* | : | |
| | : | |
| DENISE WALKER, Warden, CCI, | : | |
| *Individual Capacity* | : | |
| | : | |
| KENNETH BUTRICKS, Warden, CCI | : | |
| *Individual Capacity* | : | |
| | : | |
| SCOTT ERFE, Warden, CCI | : | |
| *Individual Capacity* | : | |
| | : | |
| TIMOTHY FARRELL, SR., Warden, CCI | : | |
| *Individual Capacity* | : | |
| | : | |
| JON BRIGHTHAUPT, Warden, CCI | : | |
| *Individual Capacity* | : | |
| | : | |
| SEAN HOWARD, Correctional Officer, | : | |
| *Official and Individual Capacities* | : | |
| | : | |
| Defendants. | : | APRIL 11, 2022 |

## <u>FIRST AMENDED COMPLAINT</u>

24704046-v1

1.      Plaintiff Luis A. Santana Jr. is an inmate in the custody of the Connecticut Department of Corrections ("DOC"). Since 2012, Mr. Santana has been incarcerated at the Cheshire Correctional Institution in Cheshire, CT ("Cheshire"). At Cheshire, Mr. Santana has routinely been subjected to isolated confinement in violation of the United States and Connecticut constitutions and, more recently, Governor Ned Lamont's Executive Order 21-1, which prohibits non-disciplinary isolated confinement and entitles inmates to more than four hours out-of-cell time per day. Defendants have either manufactured or authorized illegal lockdowns at Cheshire. Cheshire correctional officers ("COs"), including Defendant Sean Howard, are affiliated with one or both of the State's two CO union chapters, AFSCME Local 387 and 1565. Over the years, union COs and DOC employees have utilized "sickouts" and other coordinated and collective use of paid time off ("PTO") to force prison lockdowns to advance their personal interests, such as bargaining for higher wages. More recently, they have used sickouts to protest their displeasure with Executive Order 21-1. The remaining Defendants are DOC administrators and wardens who are fully aware of the COs' machinations and yet nevertheless bow to the whims of these COs and continue to authorize illegal lockdowns.

2.      COs have stated that they object to permitting Mr. Santana and other inmates to enjoy his or their constitutionally and legally guaranteed out-of-cell time. CO opposition to inmate out-of-cell time is one of several motives behind the manufacturing of staff shortages to cause lockdowns that confine Mr. Santana and other prisoners to their cells. This opposition derives in part from widespread animosity among COs towards inmates like Mr. Santana. On multiple occasions, COs have stated that inmates like Mr. Santana are "undeserving" of out-of-cell time simply because they are inmates. This animosity is common among COs at Cheshire.

3.      There is no legitimate penological interest in the inhumane conditions caused by these illegal lockdowns. These lockdowns are not being used to redress any real danger or emergency. As such, they constitute the repeated, intentional, and unlawful confinement of Mr. Santana to his cell, often for days at a time.

4.      When locked-down, Mr. Santana is confined to a poorly ventilated concrete cell of approximately sixty square feet, complete with unsanitary drinking water, a steel metal door, a four-inch wide window, a bed and toilet. During lockdown, meals are eaten mere feet away from the toilet that disposes of his urine and excrement. As the showers are in a communal area out-of-cell and can only be accessed during scheduled recreational time, lockdowns often force Mr. Santana to forgo showering and other basic hygienic practices for days at a time. Prison resources, such as the library or the gym, are similarly inaccessible to Mr. Santana during lockdown. Frequent lockdowns also produce severe social isolation. Because cells are divided from each other by thick concrete walls that prevent socialization with others in his block, during lockdown Mr. Santana's life is reduced to a single isolated box, cut off not only from society at large but also from anybody outside his cell. As recognized in *Reynolds v. Arnone*, a recent case by this Court, that isolated confinement "inflicts severe harm on prisoners" is "well documented." 402 F. Supp. 3d 3, 12 (D. Conn. 2017), *rev'd in part*, 990 F.3d 286 (2d Cir. 2021). Mr. Santana is no exception, as Defendants' repeated abuse and authorization of illegal lockdowns has caused his mental health to deteriorate.

5.      Defendants' recurring isolated confinement of Mr. Santana violates the United States Constitution, the Connecticut Constitution, and EO 21-1. Defendants' permissive conduct was either intentional or conducted with deliberate indifference towards the effects of lockdown abuse on Mr. Santana. First, the persistent use of isolated confinement presents a known and

scientifically documented risk of physical and mental harm that is inconsistent with prevailing standards of decency. As such, it constitutes cruel and unusual punishment in violation of the Eighth Amendment of the United States Constitution and Article I, §§ 8, 9 of the Connecticut Constitution. Second, the imposition of lockdowns unmotivated by any legitimate penological interest is an arbitrary punishment and violates the Eighth Amendment and Fourteenth Amendments of the United States Constitution and Article I, §§ 8, 9 of the Connecticut Constitution. Third, the conditions of Mr. Santana's incarceration violate the terms of EO 21-1, constitute an atypical and significant hardship, and deprive Mr. Santana of a protected liberty interest without due process in violation of the Fourteenth Amendment of the United States Constitution and Article I, §§ 8, 9 of the Connecticut Constitution.

## JURISDICTION AND VENUE

6.      Plaintiff Luis A. Santana, Jr. ("Mr. Santana") brings claims pursuant to 42 U.S.C. § 1983, the Eighth and Fourteenth Amendments to the United States Constitution, the Connecticut Constitution, and Executive Order 21-1.

7.      This Court has jurisdiction over Mr. Santana's Eighth and Fourteenth Amendment claims pursuant to 28 U.S.C. § 1331.

8.      This Court has jurisdiction over Mr. Santana's State law claims pursuant to 28 U.S.C. § 1367, and insofar as the violation of rights guaranteed by State law infringes upon federally protected due process, it also has jurisdiction pursuant to 28 U.S.C. § 1331.

9.      Venue is proper under 28 U.S.C. § 1391 because Defendants reside in this district and because a substantial part of the events giving rise to these claims herein occurred in the District of Connecticut.

**PARTIES**

10.     Luis A. Santana Jr. is a 37-year old man who has a mother and father, five sisters, and one brother.  He is a practicing Protestant who has been held at Cheshire Correctional Institution since November 2012.

11.     Defendant Angel Quiros ("Quiros") is the current Commissioner of the DOC, a position he first held in an interim capacity in July 2020 and has held as a confirmed appointee since February 2021. At all relevant times, he acted under color of State law. As the highest-ranked official in the DOC, Quiros is responsible for authorizing, setting, and maintaining the policies of the DOC State-wide. He was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Quiros is sued in his official capacity for injunctive relief.

12.     Defendant Nick Rodriguez ("Rodriguez") is the current District Administrator for District One of the DOC, a position he has held since 2020 and one of multiple positions he holds in the administration of Connecticut's prisons. Cheshire is one of several correctional institutions located in District One. At all relevant times, Rodriguez acted under color of State law. As District Administrator, Rodriguez is responsible for supervising the activities of correctional staff within the district, for reviewing appeals of inmate complaints in DOC's internal grievance system, and for authorizing, setting and maintaining district-level policies on DOC staff conduct and lockdowns. He was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Rodriguez is sued in his official capacity for injunctive relief.

13.     Defendant Jennifer Reis (née Peterson) ("Reis") is the current Warden of Cheshire, a position she has held since 2021. At all relevant times, she acted under color of State law. As the Warden of Cheshire, Reis has direct knowledge of and authority over the conditions of incarceration at Cheshire, and she is responsible for directly managing and setting facility-level policies that regulate the conduct of DOC staff at Cheshire. Reis is also responsible for setting the facility-level policies governing the use of lockdowns. Reis, in her former role as Deputy Warden, also handled the lowest level of inmate complaints in the internal grievance system and reviewed and denied Mr. Santana's Level 1 grievance. She was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Reis is sued in her official capacity for injunctive relief and in her individual capacity for damages.

14.     Defendant Denise Walker ("Walker") was the warden of Cheshire from 2020–2021. At all relevant times, she acted under color of State law. As the Warden of Cheshire, Walker had direct knowledge of and authority over the conditions of incarceration at Cheshire, and she was responsible for directly managing and setting facility-level policies that regulated the conduct of DOC staff at Cheshire. Walker was also responsible for setting the facility-level policies governing the use of lockdowns. She was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Walker is sued in her individual capacity for damages.

15.     Defendant Kenneth Butricks ("Butricks") was the warden of Cheshire from 2019–2020. At all relevant times, he acted under color of State law. As the Warden of Cheshire, Butricks had direct knowledge of and authority over the conditions of incarceration at Cheshire, and he was responsible for directly managing and setting facility-level policies that regulated the conduct of DOC staff at Cheshire. Butricks was also responsible for setting the facility-level

policies governing the use of lockdowns. He was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Walker is sued in his individual capacity for damages.

16.     Defendant Scott Erfe ("Erfe") was the warden of Cheshire from 2015–2019. At all relevant times, he acted under color of State law. As the Warden of Cheshire, Erfe had direct knowledge of and authority over the conditions of incarceration at Cheshire, and he was responsible for directly managing and setting facility-level policies that regulated the conduct of DOC staff at Cheshire. Erfe was also responsible for setting the facility-level policies governing the use of lockdowns. He was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Erfe is sued in his individual capacity for damages.

17.     Defendant Timothy Farrell Sr. ("Farrell") was the warden of Cheshire from 2014–2015. At all relevant times, he acted under color of State law. As the Warden of Cheshire, Farrell had direct knowledge of and authority over the conditions of incarceration at Cheshire, and he was responsible for directly managing and setting facility-level policies that regulated the conduct of DOC staff at Cheshire. Farrell was also responsible for setting the facility-level policies governing the use of lockdowns. He was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Farrell is sued in his individual capacity for damages.

18.     Defendant Jon Brighthaupt ("Brighthaupt") was the warden of Cheshire from 2011–2014. At all relevant times, he acted under color of State law. As the Warden of Cheshire, Brighthaupt had direct knowledge of and authority over the conditions of incarceration at Cheshire, and he was responsible for directly managing and setting facility-level policies that regulated the conduct of DOC staff at Cheshire. Brighthaupt was also responsible for setting the

facility-level policies governing the use of lockdowns. He was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Brighthaupt is sued in his individual capacity for damages.

19.     Defendant Sean Howard ("Howard") is a CO at Cheshire. Upon information and belief, Mr. Howard is or was the President of AFSCME Local 387. At all relevant times, he acted under color of State law. He was aware of and personally and directly involved in organizing or sanctioning the use of sickouts and other manufactured staff shortages to cause prison-wide lockdowns. As such, he was personally involved in authorizing and maintaining the policies and customs challenged by Mr. Santana. Howard is sued in his official capacity for injunctive relief and in his individual capacity for damages.

## FACTUAL BACKGROUND

20.     Over the past ten years, Defendants have repeatedly subjected Mr. Santana, along with other Cheshire inmates, to prolonged breaks in social contact through the partial and total denial of nominally scheduled out-of-cell time. The cumulative effect of these arbitrary denials of out-of-cell time amounts to what Governor Lamont recently defined as "isolated confinement" and prohibited as inconsistent with the "human dignity of incarcerated people." *See* Exhibit A at 1.

21.     The deleterious effects of isolated confinement are well-documented scientifically. The conditions of Mr. Santana's confinement and the disregard for his rights under the United States and Connecticut constitutions and EO 21-1 serve no legitimate penological interest or security concern. Instead, Defendants bow to the machinations of Cheshire COs who, acting out of personal self-interest and animosity, organize sickouts that illegally produce lockdowns.

### *The Pattern and Practice of Denying Out-of-Cell Time is*
### <u>*Longstanding and Consistent Across Different Prison Administrations*</u>

22.     Mr. Santana was transferred to Cheshire from MacDougal-Walker Correctional

Institute in 2012 and he has since remained at Cheshire. As such, Mr. Santana has an intimate

familiarity with Cheshire's policies for out-of-cell time over the past decade.

23.     From Mr. Santana's arrival at Cheshire in 2012 until the middle of 2014, inmates

were scheduled for two hours per day of out-of-cell time ("Rec Time"), plus an additional twenty

minutes each for lunch and dinner. This meant that Mr. Santana was confined to his cell for

nearly 22 hours or more per day. For security reasons, the guards staggered when inmates

received their Rec Time by dividing the population into two "tiers," which were assigned to

different periods for Rec Time. As no additional time was scheduled for showering or hygiene,

inmates spent much of their Rec Time jockeying with other inmates in their tier for access to the

showers, phones, and other limited capacity resources at the prison.

24.     Despite the calendar officially scheduling two hours of Rec Time each day from

2012–2014, Mr. Santana often received far less. Lockdowns were frequent and unpredictable.

Through a combination of full lockdowns of the entire prison and partial lockdowns that

deprived Mr. Santana of his Rec Time, the average amount of time spent by Mr. Santana out-of-

cell was far lower than the minimal amount formally required by DOC policy. As a result, Mr.

Santana would often be confined to his cell for 23 hours or more per day.

25.     Defendant Scott Erfe became warden of Cheshire in 2015, a position he occupied

until 2019. During Erfe's tenure, inmates were nominally granted three additional hours per

week out-of-cell for gym and fitness time ("Gym Time"), with Mr. Santana's three hours

scheduled for the afternoon on Mondays, Wednesdays and Saturdays. This time could only be

spent in Cheshire's indoor gym or, during the warm summer months, outdoors. Despite these

limitations, inmates enjoyed Gym Time as a rare opportunity to socialize outside of their block.

26.     However, due to constant lockdowns, Mr. Santana rarely received anywhere near

the scheduled amount of out-of-cell time. Shortly after inmates were to begin receiving Gym

Time, Cheshire, under Erfe's direction, began systematically locking down every Wednesday

and Friday morning during the first shift for "staff training."  These systematic lockdowns

deprived Mr. Santana of his morning Rec Time on those days. Upon information and belief,

despite the ostensible purpose of these lockdowns, Cheshire COs routinely used these lockdowns

as time off for personal purposes. Due to the duration of these lockdowns and the fact that they

fell on the same days as his Gym Time periods, Mr. Santana saw little change in his average

amount of out-of-cell time. Additionally, weekend lockdowns, previously a rarity, started

occurring during Erfe's administration, routinely costing Mr. Santana his weekend Gym Time

and Rec Time.

27.     Despite changes in prison administration, lockdowns continued. Defendant

Kenneth Butricks became warden in 2019 and continued the scheduled Wednesday and Friday

lockdowns, as well as weekend lockdowns.  These lockdowns deprived Mr. Santana of basic

human needs like exercise and socialization.

28.     The Covid-19 pandemic arrived in Connecticut in early 2020. As a measure to

reduce the spread of Covid-19, the three scheduled hours of Gym Time were entirely suspended

and the daily two hours of Rec Time were truncated. Starting in April 2020, inmate Rec Time

was reduced from an hour to a half hour each in the morning and afternoon shift, gradually

increasing over the course of the pandemic to forty-five minutes per shift before returning to the

original scheduled level of one hour per shift. Even these extraordinarily short windows of out-

of-cell time scheduled for Mr. Santana were not honored by Defendants, and random lockdowns that removed most or all of this time were constant.

29.     On June 30, 2021, Governor Lamont issued EO 21-1. This order, among other things, mandates that absent "extraordinary circumstances" or disciplinary status, inmates are not to be confined to their cells for "twenty or more hours per day." In response to this order, Cheshire modified the scheduled out-of-cell time allotted to inmates. In addition to 20 minutes each for lunch and dinner, Mr. Santana was to receive one hour and forty minutes of Rec Time each in the first and second shifts. Collectively, the meal and Rec Time adds up to exactly four hours each day.

30.     Since the enactment of EO 21-1, lockdowns at Cheshire have been commonplace. There have been dozens of illegally manufactured lockdowns, depriving Mr. Santana of the four hours out-of-cell time to which is he entitled.

31.     When on lockdown, Mr. Santana typically loses at least one, if not both, of his two Rec Time periods. Any meal breaks during lockdown are also canceled, and meals are instead eaten in his cell, mere feet away from his toilet. Lockdowns for an entire day are also common, particularly on holidays.

32.     Upon information and belief, since 2014 Santana has frequently been locked-down several times per week and confined to his cell for days at a time.

33.     Defendants have not provided Mr. Santana with the amount of out-of-cell time required under the United States Constitution, EO 21-1, or Cheshire's own schedules, violating his liberty interest in the enforcement of this State law.

### _Defendants Have Engaged in the Gross Abuse of Lockdowns_

34.     A lockdown is an "emergency response," meant to allow prison officials to immediately impose order in times of distress or danger. *See Anderson v. Coughlin*, 700 F.2d 37, 44 (2d Cir. 1983). To this end, courts in this Circuit have long held that the deference afforded to prison officials in their exercise of emergency powers is not unlimited and must not reflect "gross abuse" of entrusted authority. *Id.* In a similar vein, EO 21-1 prohibits isolated confinement of incarcerated persons unless it is justified by either disciplinary status or "extraordinary circumstances [due to] a serious incident resulting in a lockdown." *See* Exhibit A at 2. Despite this clear guidance intended to limit lockdowns to emergency situations, Defendants have repeatedly subjected Mr. Santana to illegal lockdowns.

35.     As alleged, in 2015 Cheshire began systematically locking down the prison every Wednesday and Friday morning for "staff training." Upon information and belief, staff training did not actually occur every Wednesday and Friday, nor did it pose an emergency that justifies a lockdown and the curtailing of Mr. Santana's out-of-cell time.

36.     Upon information and belief, COs at Cheshire affiliated with the AFCME Local 387 union have repeatedly organized the collective use of sickouts as a tool to force lockdowns. The sickouts are employed to artificially generate staff shortages as leverage for pay raises or to protest legislation aimed at providing prisoners more time out-of-cell. Such lockdowns are not emergencies, nor do such lockdowns constitute "extraordinary circumstances" caused by a "serious incident" as those terms are used in EO 21-1.

37.     Upon information and belief, COs at Cheshire have repeatedly used block- or facility-wide lockdowns or the threat thereof as a disciplinary tool against individual inmates. As the lockdown is not or would not be caused by an emergency or "extraordinary circumstances"

caused by a "serious incident," a pretext such as an inaccurate claim of "staff shortages" despite adequate staff presence would be used as justification instead.

38.     Upon information and belief, many COs, including Howard, are personally or politically hostile to increasing the amount of out-of-cell time Mr. Santana and other inmates receive. Since EO 21-1 was enacted, COs have continued to state that inmates like Mr. Santana "don't deserve" additional time out-of-cell, that they would "never allow" inmates to get the additional time out-of-cell required by EO 21-1, and disparagingly calling the order "ridiculous." These statements are contextualized by aggressive political lobbying by AFSCME Local 387, the union that represents Cheshire staff, against S.B. 1059 ("PROTECT Act"), a 2021 Connecticut bill that would have banned solitary confinement and set a statutory minimum number of out-of-cell hours. Defendants are fully aware of these actions but nevertheless permitted and continue to permit the illegal lockdowns to occur.

39.     Manson Youth Institution is a juvenile subdivision of Cheshire. On December 21, 2021, the U.S. Department of Justice ("DOJ") released a report that found, *inter alia*, that Manson has been violating the Eighth and Fourteenth Amendment rights of the children in its custody through the unconstitutional abuse of isolated confinement as punishment. *See* Exhibit B at 1. According to the DOJ's report, the actions of Manson COs and administration demonstrate "a pattern or practice of resistance to the full enjoyment [by inmates] of rights protected by the Constitution and federal law." *Id.* Manson is physically located on an adjacent lot and is within walking distance of Cheshire. AFSCME Local 387, of which Howard is the president, includes COs from both Manson and Cheshire.

40.     Mr. Santana has sought to address the serious constitutional violations through Cheshire's grievance procedure. Mr. Santana has exhausted all available administrative remedies

prior to commencing suit. DOC has acknowledged that Mr. Santana has exhausted all available administrative remedies.

41.     On July 29, 2020, Mr. Santana wrote an informal resolution to Defendant Butricks to challenge the cruel and unusual conditions of his confinement he has endured since 2012 due to rampant lockdowns and in-cell isolation. The informal resolution stated that the limited out-of-cell time afforded Mr. Santana without regard to misconduct or rehabilitative goal was illegal and was adversely affecting Mr. Santana's mental health. *See* Exhibit C. Butricks ignored Mr. Santana.

42.     Mr. Santana informed Butricks of intentional staff shortages created by DOC staff who abused their "emergency leave" time and "sick leave" time to create lockdowns to deprive inmates of out-of-cell time. Despite Butricks' knowledge of intentional staff shortages, Butricks did nothing to address the situation and permitted the lockdowns to continue.

43.     On or about August 18, 2020, Mr. Santana filed a Level 1 grievance after Butricks ignored Mr. Santana's informal resolution. The grievance challenged as illegal the conditions of Mr. Santana's confinement, namely the lack of sufficient out-of-cell time. Mr. Santana explained that the conditions of his confinement are "really affecting my mental health in that I have difficulties thinking, concentrating, remembering things, and controlling my impulses." *See* Exhibit D.

44.     Mr. Santana's Level 1 grievance was denied by Defendant Reis on September 28, 2020. *See* Exhibit D. Reis knew of staff shortages at Cheshire intentionally created by DOC staff who abused their "emergency leave" time and "sick leave" time to create lockdowns and deprive inmates of out-of-cell time. Reis did nothing to address the situation and permitted the lockdowns to continue.

45.     On or about September 30, 2020, Mr. Santana filed a Level 2 grievance to appeal the denial of his Level 1 grievance. Mr. Santana again challenged the conditions of his isolated confinement.

46.     Mr. Santana's Level 2 grievance was denied by Defendant Rodriguez on November 12, 2020. The decision denying the Level 2 grievance indicated that an "[a]ppeal to Level 3 will not be answered." *See* Exhibit F.

47.     On or about November 25, 2020, Mr. Santana filed a Level 3 grievance to appeal the Level 2 decision. *See* Exhibit G.

48.     Mr. Santana's Level 3 grievance was denied on November 30, 2020. The decision stated that "[t]his Level 3 appeal is being returned to you because you have exhausted your remedies for this issue. On the level 2 disposition the director clearly checked the box under his signature which states, you have exhausted the departments [sic] administrative remedies. Appeal to Level 3 will not be answered." *See* Exhibit H.

49.     Even after exhausting his administrative remedies, Mr. Santana continued to inform Defendants of the illegal conditions of his confinement and the significant harm it has caused to his mental health.

50.     Mr. Santana wrote to Walker on June 13, 2021 to inform Walker that isolated confinement has resulted in his memory loss, difficulty concentrating, difficulty controlling his impulses, and increased levels of stress and anxiety. Walker ignored Mr. Santana.

51.     On June 19, 2021, Mr. Santana again wrote to Walker. Mr. Santana reiterated to Walker the significant harm to his mental health caused by the manufactured lockdowns and his isolated confinement.

52.     As a direct and proximate result of Defendants' actions in placing Mr. Santana in isolated confinement, Mr. Santana's mental health has deteriorated. Mr. Santana has suffered and endured, and continues to suffer and endure, emotional and psychological distress due to his isolated confinement.

53.     In May 2021, Mr. Santana informed DOC's medical staff in writing that due to his conditions of confinement, his mental health was rapidly declining. He informed DOC's medical staff that he "flipped out" on at least two officers and another inmate due to constant lockdowns and insufficient out-of-cell time. He informed medical staff that the constant lockdowns were a form of psychological torture and abuse.

54.     On or about June 5, 2021, Mr. Santana was examined by medical staff regarding his deteriorating mental health. Staff advised Mr. Santana that he should get more exercise to help with his mental health. Mr. Santana cannot get more exercise when he is confined to his cell.

55.     Medical staff also informed Mr. Santana that electronic tablet devices were to be distributed and would help with his mental health issues. Although medical staff stated they would continue to follow-up with Mr. Santana, they have never done so. The lockdowns continue to adversely affect Mr. Santana's mental health. The tablets have not helped to lessen the adverse impact to Mr. Santana's mental health.

56.     Mr. Santana further informed medical staff that Defendants know about the sickouts and illegal lockdowns. Mr. Santana also wrote to Quiros to inform Quiros of the manufactured sickouts and illegal lockdowns, and their harmful effect on Mr. Santana. Quiros ignored Mr. Santana.

57.     Defendants know that DOC staff has manufactured and continues to manufacture staff shortages through abuse of sick time and emergency leave to result in lockdowns to deprive inmates of out-of-cell time.

58.     Defendants know that DOC staff has manufactured and continues to manufacture staff shortages as a bargaining tool to advocate for increased pay.

59.     Defendants know that DOC staff has manufactured and continues to manufacture staff shortages to protest changes in state law, such as the PROTECT Act and EO 21-1, to deprive Mr. Santana of out-of-cell time.

60.     Defendants permit DOC staff to manufacture staff shortages and have repeatedly authorized the use of lockdowns in direct response, which has deprived inmates of out-of-cell time.

61.     Defendants are aware that there is an obvious risk that isolated confinement will have a deleterious effect on an inmate's mental health.

62.     Defendants know that the isolated confinement caused by the repeated use of lockdowns has adversely affected Mr. Santana's mental health

63.     Defendants have been deliberately indifferent to Mr. Santana's serious medical needs and have disregarded the obvious risk that isolated confinement and abuse of lockdowns has had and will continue to have on Mr. Santana's mental health.

64.     Defendants have refused to make changes to or correct Mr. Santana's conditions of confinement.

65.     As a direct and proximate result of Defendants' violations of the United States Constitution and State law, Mr. Santana has been and will continue to be irreparably injured. He has no adequate remedy at law for Defendants' actions and will suffer irreparable harm to his

constitutional rights unless Defendants are enjoined from continuing their unlawful policies, practices or customs which have directly and proximately caused these abuses.

66.     Defendants' actions have and will continue to harm Mr. Santana. Based on the pattern and practice of Defendants' ongoing illegal actions described herein, there is the continued threat of violation of federal law in the future. Absent court intervention, Mr. Santana will continue to be irreparably harmed through Defendants' violation of the requirements of EO 21-1. The balance of equities favors issuing an injunction to prevent Defendants' continued violation of EO 21-1. Mr. Santana has no adequate remedy at law.

**FIRST CAUSE OF ACTION**

**(Violation of Eighth and Fourteenth Amendment to the U.S. Constitution pursuant to 42 U.S.C. § 1983 – Isolated Confinement Constituting Cruel and Unusual Punishment) (Against All Defendants)**

67.      Mr. Santana incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

68.     The Eighth Amendment of the United States Constitution, incorporated against the states through the Fourteenth Amendment, prohibits state actors from inflicting cruel and unusual punishment that violates society's "evolving standards of decency." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

69.     By their policies, practices, and customs described herein, Defendants have arbitrarily deprived and intend to indefinitely continue arbitrarily depriving Mr. Santana of his constitutionally protected right to be free from cruel and unusual punishment by subjecting him to illegal isolated confinement. Isolated confinement presents a known and scientifically documented risk of physical and mental harm that is inconsistent with prevailing standards of decency.

70.     Over the past decade, Mr. Santana has increasingly been subjected to unjustified lockdowns, starting at an average of twice per week in 2014 and increasing to a high of four times per week or more over the following years. This recurring social isolation has caused serious psychological and physical injury to Mr. Santana and creates an identifiable and substantial future risk of further serious and debilitating psychological and physical injury to Mr. Santana.

71.     These lockdowns are not motivated by any legitimate penological interest but instead by the self-interest of COs at Cheshire. Defendants have demonstrated deliberate indifference to the abuse of paid time off by COs to artificially manufacture staff shortages, despite the identifiable and substantial risk of harm posed to Mr. Santana by isolated confinement.

72.     Defendants refuse to remedy or address in any way the widespread manufacturing of staff shortages to create lockdowns.

73.     Defendant Howard is actively involved in manufacturing sickouts to force lockdowns.

74.     Defendants consistently authorize lockdowns which result from manufactured staff shortages.

75.     Defendants have further engaged in the gross abuse of lockdowns by issuing them under various pretexts unrelated to any legitimate penological interest.

76.     Through their actions, omissions, and deliberate indifference, and authorization of illegal lockdowns, Defendants have violated Mr. Santana's right to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments of the federal Constitution.

## SECOND CAUSE OF ACTION

**(Violation of Article I, §§ 8, 9 of the Connecticut Constitution –
Isolated Confinement Constituting Cruel and Unusual Punishment)
(Against All Defendants)**

77.     Mr. Santana incorporates by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

78.     Under *State v. Santiago*, 318 Conn. 1, 17 (2015), the State of Connecticut

prohibits cruel and unusual punishment as modeled after the federal right. This right is

recognized under Connecticut's due process provisions in Article I, §§ 8, 9.

79.     For the reasons stated in the paragraphs of the First Cause of Action, Defendants

have through their actions, omissions, deliberate indifference, and authorization of illegal

lockdowns deprived Mr. Santana of the right to be free from cruel and unusual punishment

guaranteed by Article I, §§ 8, 9 of the Connecticut Constitution.

## THIRD CAUSE OF ACTION

**(Violation of Eighth and Fourteenth Amendment to the U.S. Constitution pursuant to
42 U.S.C. § 1983 – Arbitrary Punishment Constituting Cruel and Unusual Punishment)
(Against All Defendants)**

80.     Mr. Santana incorporates by reference each and every allegation contained in the

preceding paragraphs as if set forth fully herein.

81.     The Eighth Amendment of the United States Constitution, incorporated against

the states through the Fourteenth Amendment, prohibits state actors from inflicting arbitrary

punishment. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 538–39 (1979); *Ingraham v. Wright*, 430

U.S. 651, 658 (1977); *McClesky v. Kemp*, 481 U.S. 279, 282 (1987); *Kennedy v. Louisiana*, 554

U.S 407, 435–36 (2008); (1977); *Furman v. Georgia*, 408 U.S. 238, 274 (1972) (J. Brennan,

concurring); *State v. Santiago*, 318 Conn. at 19.

82.     Conditions of confinement constitute punishment if there is intent to punish, if the condition lacks rational relationship to a legitimate penological purpose, or if the condition is excessive relative to the needs of its penological purpose. *Bell v. Wolfish*, 441 U.S. at 538–39.

83.     Statements made by Cheshire COs, like Howard, that claim isolated confinement through constant lockdowns is what inmates like Mr. Santana "deserve" show an explicit intent to punish. Defendants have bowed to the pressure of these COs and their respective unions to permit isolated confinement to be used as a form of punishment.

84.     Lockdowns based upon the personal self-interest of COs, such as those caused by a "sickout" to generate leverage in a labor dispute, so officers can spend Super Bowl Sunday at home, or to punish Mr. Santana are pretextual and lack a rational relationship to a legitimate penological purpose.

85.     Defendants, through actions and omissions that constitute either deliberate indifference or gross abuse, including through their repeated authorization of illegal lockdowns, have repeatedly engaged in a pattern of behavior that subjects Mr. Santana to lockdowns constituting arbitrary punishment. As such, Defendants' actions and omissions violate Mr. Santana's right to be free from cruel and unusual punishment guaranteed by the Eighth and Fourteenth Amendments of the United States Constitution.

## FOURTH CAUSE OF ACTION

**(Violation of Fourteenth Amendment to the U.S. Constitution pursuant to
42 U.S.C. § 1983 - Arbitrary Punishment Violating Substantive Due Process)
(Against All Defendants)**

86.     Mr. Santana incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

87.     Substantive due process recognizes a liberty interest against arbitrary punishment that stands independent of any Eighth Amendment right. "An arbitrary, or disproportionate sanction, or one that furthers no legitimate penological objective, constitutes punishment (and, thus, is proscribed by the Fourteenth Amendment)." *Surprenant v. Rivas*, 424 F.3d 5, 13 (1st Cir. 2005); *see also Bell v. Wolfish*, 441 U.S. at 539 (discussing substantive due process protection against arbitrary punishment for pretrial detainees).

88.     For the reasons stated in the paragraphs of the First and Third Causes of Action, Defendants have, through their actions, omissions, gross abuse of lockdowns, and deliberate indifference to the actions of subordinate COs, deprived Mr. Santana of the right to be free from arbitrary punishment guaranteed by the Fourteenth Amendment of the federal Constitution.

## FIFTH CAUSE OF ACTION

### (Violation of Article I, §§ 8, 9 of the Connecticut Constitution – Arbitrary Punishment Constituting Cruel and Unusual Punishment) (Against All Defendants)

89.     Mr. Santana incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

90.     The Connecticut Constitution declares that no person shall "be deprived of life, liberty or property without due process of law" and that "no person shall be … punished, except in cases clearly warranted by law." Conn. Const. art. I, §§ 8, 9.

91.     For the reasons stated in the paragraphs of the First, Third, and Fourth Causes of Action, Defendants have, through their actions, omissions, gross abuse of lockdowns, and deliberate indifference to the actions of subordinate COs, deprived Mr. Santana of the right to be free from arbitrary punishment guaranteed by the Connecticut Constitution.

## SIXTH CAUSE OF ACTION

22

**(Violation of Fourteenth Amendment to the U.S. Constitution pursuant to
42 U.S.C. 1983 – Liberty Interest in Enforcement of State Law Protected by Due Process)
(Against All Defendants)**

92.     Mr. Santana incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

93.     "States may in certain circumstances create liberty interests that are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 472 (1995). For an inmate, a protected liberty interest arises when the violation of state law "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id.*

94.     Since June 2021, Connecticut EO 21-1 has established minimum standards for out-of-cell time for inmates. Per its terms, an inmate who does not have disciplinary status must not spend twenty or more hours in their cell, while inmates on disciplinary status are still entitled to at least two hours out-of-cell. *Id.* at 2. The only exception to these minimum standards is for "extraordinary circumstances [due to] a serious incident resulting in a lockdown." *Id.*

95.     A prison lockdown is intended to be an emergency response that suspends normal prison programming and curtails inmate liberty as a temporary security measure. The word "lockdown" itself demonstrates an atypical emergency situation, and the restrictions involved in a lockdown necessarily impose a "significant hardship on the inmate" compared to ordinary prison conditions. By describing a lockdown as something that results from "extraordinary circumstances" that were caused by a "serious incident," the order further indicates that lockdowns are an atypical event.

96.     Defendants' actions in confining Mr. Santana to his cell through illegal lockdowns are atypical because they have occurred for approximately ten years.

97.     Defendants' actions in confining Mr. Santana to his cell through illegal lockdowns are atypical because of the significant adverse impact it has had on Mr. Santana's mental health.

98.     Isolated confinement arising from a lockdown "inflicts severe harm on prisoners." *Reynolds v. Arnone*, 402 F. Supp. 3d at 12. The mental and physical harm that can result from the social isolation caused by lockdowns constitutes a "significant hardship" for due process purposes. Repeated lockdowns caused by manufactured staff shortages have significantly and adversely affected Mr. Santana's mental health.

99.     Lockdowns based upon the personal self-interests of COs, such as those caused by sickouts to generate leverage in a labor dispute or so officers can spend Superbowl Sunday at home, are not lockdowns based upon a "serious incident" and as such violate EO 21-1's prohibition against isolated confinement. Because the lockdowns impose an atypical and significant hardship on Mr. Santana, due process dictates that he has a protected liberty interest in ensuring defendants obey the law.

100.     Defendants, through their actions and omissions, have repeatedly engaged in a pattern of lockdowns in violation of EO 21-1 that subjects Mr. Santana to atypical and significant hardship, violating Mr. Santana's liberty interest guaranteed by the Fourteenth Amendment of the United States Constitution.

## SEVENTH CAUSE OF ACTION

**(Declaratory Judgment – Conn. Gen. Stat. § 52-29)**
**(Against Defendants Quiros, Rodriguez, Reis, and Howard)**

101.     Mr. Santana incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

102.     EO 21-1 entitles inmates to at least four hours out-of-cell time per day absent "extraordinary circumstances."

103.     EO 21-1 defines "extraordinary circumstances" as "a serious incident resulting in a lockdown of a substantial portion of a correctional facility."

104.     Manufactured staff shortages create lockdowns (a) to protest the enactment of EO 21-1, and (b) for use as a bargaining tool to for increased wages do not constitute extraordinary circumstances.

105.     Defendants' continued authorization of lockdowns since June 30, 2021 in response to manufactured staff shortages violates the plain terms of EO 21-1.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Luis Santana, Jr. requests relief as follows:

    (a)     For all Counts, against Defendants Quiros, Rodriguez, Reis, and Howard (official capacities):

        (i)     A declaration that said Defendants' actions described herein violate the Eighth and Fourteenth Amendments to the United States Constitution;

        (ii)     A declaration that said Defendants' actions described herein violate Executive Order 21-1;

(iii)    A permanent injunction requiring the immediate cessation of the abuse of sickouts or other illegal lockdowns as described herein;

(iv)     Present a plan to the Court within 30 days that would require mandatory staff ratios or restrictions on the use of PTO to ensure that there are enough correctional officers scheduled to absorb any absences.

(b)    For Counts One through Six, against Defendants Reis, Butricks, Walker, Erfe, Farrell Sr., Brighthaupt, and Howard (individual capacities):

(i)    Awarding compensatory, punitive, and nominal damages for their violations of Mr. Santana's rights under the United States and Connecticut constitutions;

(ii)    Awarding Mr. Santana costs and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

(iii)    Granting Mr. Santana prejudgment and post-judgment interest; and

(iv)    Granting such other and further relief as the Court deems just and proper.

PLAINTIFF,
LUIS A. SANTANA, JR.

By */s/ Evan J. Seeman*
    Evan J. Seeman (ct285446)
    Robinson & Cole LLP
    280 Trumbull Street
    Hartford, CT 06103-3597
    Tel. No.: (860) 275-8200
    Fax No.: (860) 275-8299
    E-mail: eseeman@rc.com

26

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically on this 11th day of April, 2022 and was served by mail to anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

By */s/ Evan J. Seeman*